# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 20-1629V
UNPUBLISHED

| | |
|---|---|
| JUDE GAYDOS,<br><br>      Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>      Respondent. | Chief Special Master Corcoran<br><br>Filed: September 10, 2024 |

*David John Carney*, Green & Schafle LLC, Philadelphia, PA, for Petitioner.

*Mallori Browne Openchowski*, U.S. Department of Justice, Washington, DC, for Respondent.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW DISMISSING TABLE CASE**[1]

   On November 19, 2020, Jude Gaydos filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that he suffered a Table injury – shoulder injury related to vaccine administration ("SIRVA") - as a result of an influenza ("flu") vaccine he received on November 22, 2017. Petition, ECF No. 1 at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters (the "SPU").

---

[1] Because this ruling contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet**. In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

For the reasons stated below, I conclude that Petitioner has not established by preponderant evidence that the onset of his shoulder pain likely occurred within 48 hours of vaccination, as required to establish a Table SIRVA claim. This case will be reassigned to my Non-SPU docket, however, to allow Petitioner an opportunity to establish a non-Table claim.

I.      **Relevant Procedural History**

Approximately fourteen months after the claim's activation, Respondent filed a Rule 4(c) Report challenging compensation. ECF No. 31. Respondent argues that Petitioner has failed to establish that he suffered shoulder pain within 48 hours of his vaccination. *Id.* at 11-13. Respondent thus asserts that Petitioner cannot meet one of the four QAI requirements for a Table SIRVA, and his case must be dismissed. *Id.*; 42 C.F.R. § 100.3(c)(10)(ii).

Thereafter, on December 20, 2022, I issued an Order to Show Cause why Petitioner's SIRVA Table claim should not be dismissed for failure to establish the onset element. ECF No. 32 at 5. Alternatively, if Petitioner consented to the dismissal of a SIRVA Table case, I noted that he would be provided an opportunity to file an Amended Petition alleging an off-Table claim for compensation. *Id.*

On February 1, 2023, Petitioner filed a Motion to Issue a Subpoena for Deposition Testimony and Production of Documents from two of his treating providers. ECF No. 34. On February 15, 2023, I convened a status conference in this case, noting at that time that I would not permit discovery until resolution of the pending Order to Show Cause. *See* Minute Entry entered February 16, 2024. I issued two orders consistent with my discussion at the status conference on February 16, 2024. Non-PDF Order issued February 16, 2023 (deferring ruling and suspending Respondent's deadline to file a Response on Petitioner's Motion to Issue a Subpoena for Deposition Testimony and Production of Documents); Scheduling Order (Non-PDF) issued February 16, 2024 (setting new deadlines for the filing of a Show Cause Response or an Amended Petition from Petitioner, and any response to Petitioner's show cause filings from Respondent).

On March 17, 2023, Petitioner filed a Response to my Order to Show Cause. ECF No. 35. Petitioner acknowledged that the medical record evidence is limited in the months following his vaccination, but argued that "he needs to fill this gap with testimonial and documentation evidence to prove his case," asserting his requested "deposition testimony could plausibly provide evidence" to substantiate the Table onset requirement. *Id.* at 10. Accordingly, Petitioner asked that the matter be reassigned out of SPU for this purpose, *Id.* at 11. In reaction, in a brief filed April 21, 2023, Respondent maintained his stance that Petitioner has not established that he suffered the onset of his injury within the established

2

time period – 48 hours – to demonstrate a Table SIRVA. ECF No. 37. Respondent further argues to the extent I interpret Petitioner's Response to my Order to Show Cause as "a Motion for Discovery," it should be denied. *Id.* at 4. This matter is now ripe for adjudication.

## II.     Issue

At issue is whether Petitioner's first post-vaccination onset (specifically pain) occurred within 48 hours as set forth in the Vaccine Injury Table and Qualifications and Aids to Interpretation ("QAI") for a Table SIRVA. 42 C.F.R. § 100.3(a)(XIV)(B) (influenza vaccination); 42 C.F.R. § 100.3(c)(10)(ii) (required onset for pain listed in the QAI).

## III.    Authority

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove, by a preponderance of the evidence, the matters required in the petition by Vaccine Act Section 11(c)(1). A special master must consider, but is not bound by, any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. Section 13(b)(1). "Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Hum. Servs.*, No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, this rule does not always apply. "Written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." *Murphy v. Sec'y of Health & Hum. Servs.*, No. 90-882V, 1991 WL 74931, *4 (Fed. Cl. Spec. Mstr. April 25, 1991), quoted with approval in decision denying review, 23 Cl. Ct. 726, 733 (1991), *aff'd per curiam*, 968 F.2d 1226 (Fed.Cir.1992)). And the Federal Circuit recently "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Hum. Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021).

The United States Court of Federal Claims has outlined four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to

document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Hum. Servs.*, 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1335 (Fed. Cir. 2014).

The Court has also said that medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery v. Sec'y of Health & Hum. Servs.*, 42 Fed. Cl. 381, 391 (1998) (citing *Blutstein v. Sec'y of Health & Hum. Servs.*, No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998). The credibility of the individual offering such fact testimony must also be determined. *Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Hum. Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id*.

The special master is obligated to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe*, 110 Fed. Cl. at 204 (citing Section 12(d)(3); Vaccine Rule 8); *see also Burns v. Sec'y of Health & Hum. Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational).

In addition to requirements concerning the vaccination received, the duration and severity of petitioner's injury, and the lack of other award or settlement,[3] a petitioner must establish that she suffered an injury meeting the Table criteria, in which case causation is presumed, or an injury shown to be caused-in-fact by the vaccination she received. Section 11(c)(1)(C).

---

[3] In summary, a petitioner must establish that he received a vaccine covered by the Program, administered either in the United States and its territories or in another geographical area but qualifying for a limited exception; suffered the residual effects of his injury for more than six months, died from his injury, or underwent a surgical intervention during an inpatient hospitalization; and has not filed a civil suit or collected an award or settlement for her injury. Section 11(c)(1)(A)(B)(D)(E).

4

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). Pursuant to the Vaccine Injury Table, a SIRVA is compensable if it manifests within 48 hours of the administration of a flu vaccine. 42 C.F. R. § 100.3(a)(XIV)(B). The criteria establishing a SIRVA under the accompanying QAI are as follows:

> Shoulder injury related to vaccine administration (SIRVA). SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm. These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction. SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc.). SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis (even if the condition causing the neurological abnormality is not known). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:
>
> (i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;
>
> (ii) Pain occurs within the specified time-frame;
>
> (iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and
>
> (iv) No other condition or abnormality is present that would explain the patient's symptoms (*e.g*. NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

### IV. Finding of Fact

I make these findings after a complete review of the record, including all medical records, declarations, Respondent's Rule 4 Report, the parties' arguments, and additional evidence filed.

### A. Medical Records

- On November 22, 2017, Petitioner received a flu vaccine during an appointment for diabetes management with Gretchen A. Perilli, MD, at LVPG Endocrinology Cedar Chest.[4] Ex. 1 at 321-322.

- Over three months later, on March 7, 2018, Petitioner was seen by Christine Tucker, CRNP, for a follow-up visit for his diabetes. Ex. 1 at 342. A physical examination was conducted, and diet and exercise modifications were discussed in association with Petitioner's representations that he had been recently "lax on diet and exercise." Ex. 1 at 342-344. The medical record contains no report or discussion of shoulder pain, or any shoulder limitations, suffered by Petitioner.

- On May 25, 2018 (now more than six months from the date of vaccination), Petitioner was seen at OAA Orthopedic Specialists by Amy Creitz, PA-C, at the referral of Dr. Perilli, for neck and low back pain. Ex. 6 at 7, 24-25. Petitioner was described as having "axial neck pain, limitations with range of motion" that were "quite persistent and severe over the past 2 months." *Id.* at 7. Petitioner stated his neck pain "began 6 months ago with significant stiffness in the neck without specific incident or injury." *Id.* at 25. Additionally, Petitioner reported "ongoing episodic severe disabling low back pain." *Id.* Petitioner underwent a thorough physical examination at this visit. *Id.* at 25-26. A general extremity exam of the upper extremities specifically found Petitioner's "[s]houlder, elbow, and wrist range of motion was normal and without pain." *Id.* at 26. Petitioner was subsequently prescribed physical therapy three times per week for four weeks. *Id.* at 28. Petitioner reported no shoulder pain or symptoms at this visit.

- In conjunction with this orthopedic appointment, Petitioner completed extensive patient questionnaires or intake forms regarding his pain and symptoms. Ex. 6 at 12-16. Petitioner was asked to mark on a diagram where his pain was located. *Id*. at 12. Petitioner marked only his neck and low back. *Id.* The forms specifically provided a space for Petitioner to provide

---

[4]Petitioner provides in his signed PAR Questionnaire that the "Specialty" for which he seeks care at LVPG Endocrinology Cedar Chest is "[p]rimary [c]are, endocrinologist, and vaccine administrator." ECF No. 9 at 2.

his current level of left arm/leg pain, however Petitioner left this inquiry blank. *Id.* Petitioner reported his back pain began "suddenly", - but 15 years prior - and questioned whether it was a work or sports injury. *Id*. at 13. By contrast, Petitioner noted that his neck pain began "gradually" six months ago. *Id.* Petitioner reported no shoulder or arm pain in these forms.

- On June 8, 2018, Petitioner underwent cervical and lumbar MRIs. Ex. 6 at 57-58, 60-61. No clinical history of shoulder or arm pain was reported in conjunction with these repots.

- On July 31, 2018, Petitioner was seen again for a follow up appointment with Dr. Perilli for his diabetes management. Ex. 1 at 371. The visit record contains discussion of his medications, eating habits and life stressors. *Id.* The record discusses in detail medical issues related to Petitioner's father and sister which were causing him stress. *Id*. A physical exam was conducted which was normal. *Id*. at 372-373. No mention of Petitioner's alleged shoulder pain or shoulder limitations is documented in this record.

- On February 13, 2019, nearly 15 months after his flu vaccination, Petitioner was seen again by Dr. Perilli for diabetes management. Ex. 1 at 401. During this appointment Dr. Perilli recorded that Petitioner had experienced a stressful year and that "[h]e has not been exercising regularly, but when he does, he is getting left sided chest pain . . . . Also, arm pain (left) unrelated to chest pain following flu vaccine last injection." *Id.* A physical exam was conducted which was normal. *Id*. at 402-403

- On March 22, 2019, Petitioner was seen by Gary Canner, MD, for an orthopedic consult for his left shoulder. Ex. 3 at 4. Dr. Canner's history states that Petitioner had a flu shot in his left shoulder in October 2017, and that "[a]fterwards, he had pain, decreased range of motion." *Id.* Petitioner reported he "had no treatment" as "[h]e was having issues with other family members and so, he devoted time to them and not himself." *Id.* An examination of Petitioner's left shoulder demonstrated "full internal rotation, external rotation and abduction." *Id.* However, it was noted Petitioner had "supraspinatus weakness with hiking" and "biceps weakness." *Id.* Dr. Canner's diagnosis was left "supraspinatus tendinitis with secondary impingement." *Id.* Petitioner was advised to follow a program of "ice, Motrin, no abduction, home exercises, [undergo an] MRI" and follow-up in three weeks. *Id.*

- On April 5, 2019, Petitioner was seen for an initial physical therapy evaluation for his left shoulder. Ex. 4 at 5. The record provides an "Onset Date" for Petitioner's injury of "10/1/2017." *Id.* at 5-6. The "Mechanism of Injury" was described as "insidious." *Id.*

7

- On April 17, 2019, Petitioner returned to see Dr. Canner. Ex. 3 at 5. Dr. Canner noted that Petitioner's left shoulder MRI showed "mild DJD" and an intact rotator cuff. *Id.* Petitioner was provided a new program of home exercises and a cortisone steroid shot was discussed as a future possibility. *Id.*

- On July 3, 2019, Petitioner had a diabetes follow-up visit with Dr. Perilli. Ex. 1 at 434. There was no discussion of shoulder or arm pain or symptoms.

- On August 6, 2019, Petitioner had an orthopedic consultation with Russell Huffman, MD with Penn Medicine, Orthopaedics Radnor practice. Ex 7 at 4-11. Dr. Huffman provides a history that Petitioner received "a flu vaccination in October or November 2017" and had "immediate pain. He took a picture of that injection site and saw that it was fairly high up into the subacromial space." Ex. 7 at 9. Dr. Huffman's impression was "persistent inflammatory reactive bursitis after a flu vaccination[] placed into the subacromial space." *Id.* at 9. Petitioner received a cortisone injection, was prescribed physical therapy, and instructed to schedule a follow up appointment in six to eight weeks. *Id.* at 9.

- Thereafter, Petitioner continued to treat his left shoulder pain.

**B. Other Evidence**

**1. Letter from Gretchen Perilli, MD.**

Petitioner has submitted an unsworn letter from Dr. Perilli, dated September 21, 2020. Ex. 8. Dr. Perilli states as follows in her letter:

> I am writing to confirm conversations you had with me at my office with respect to an onset of shoulder pain that later worsened and required repeat cortisone injections. Based on our interactions and conversations, you indicated that your shoulder pain began after receiving an influenza vaccination on November 22, 2017 which you received in my office. You then verbally reported your shoulder complaints to one of my nurse practitioners during your March 2018 visit. We discussed your shoulder complaints during your July 2018 visit where the visit was primarily for review of your diabetes mellitus type 1. During this visit, you indicated that you felt your shoulder pain was from the November 2017 influenza vaccine; you indicated you were being followed by Dr. James C. Weis at OAA Orthopedics Specialists for neck pain and limited range of motion that began after your shoulder pain started.

> While these discussions were not specifically documented in your medical records since I only evaluate and treat you for your ongoing diabetes, I wanted to confirm that you did report to me and my office that your shoulder pain began shortly after receiving your influenza vaccine on November 22, 2017. Please advise if you have any further questions about this.

Ex. 8.

### 2. Photograph of Left Shoulder

Petitioner submitted a photograph of himself standing upright with a band aide on his left shoulder, as well as photographs of the file information pertaining to the first photograph from his cell phone. Ex.16. The file information provides that the photograph of Petitioner was taken on November 23, 2017, one day after Petitioner's November 22, 2017 flu vaccine.

### 3. Petitioner's Declarations

Petitioner submitted two sworn declarations in support of his claim. Exs. 2, 17. In his initial declaration, Petitioner states that he "immediately felt pain and soreness at the injection site" following his November 22, 2017 flu vaccination, "which increased throughout the day and the following days." Ex. 2 at 3. He states that the pain was so significant and unusual that he had his "girlfriend, Lori Piscitelli, take a picture of the Band-Aid that was placed at the injection site by the nurse administering the vaccine." *Id.* Petitioner states that although his shoulder pain persisted, and his range of motion was becoming "increasingly limited", he decided since it was not "life threatening" he would wait until his March 17, 2018 appointment with Dr. Perilli to ask about his shoulder. *Id*. Petitioner states that on March 17, 2018, he was seen by Ms. Tucker instead of Dr. Perilli. He alleges that he explained his shoulder issues to Ms. Tucker who was unable to offer him any "advice or treatment recommendations for [his] shoulder injury." *Id.* at 3-4.

Petitioner states that thereafter he began to experience pain in his neck and upper back, which he (initially) did not believe was related to his shoulder. *Id.* at 4. Petitioner states that in the spring of 2018, his sister experienced a traumatic brain injury that required a considerable amount of his time and attention, and that during the acute phase of her injury he only had a few medical appointments related solely to his neck problems. Petitioner asserts that he did not raise his shoulder injury at this orthopedic appointment because he did not think it was related to his neck pain. *Id.*

Petitioner states in July 2018 he was seen again for Dr. Perilli for his diabetes, and that he discussed both his neck and shoulder issues with her. *Id.* at 5. He states that although at the time he did not think the two issues were related, he later determined that they were linked together. *Id.* Petitioner relates that in February of 2019, he experienced a "sharp pain and constant pain" when "attempting to unload and fire muzzleloader firearms" which made him "realize[] that it was crucial for me to seen an orthopedic doctor

9

as my shoulder's condition was only worsening and not improving." *Id.* Petitioner states that he then made a point of addressing his neck and shoulder pain with Dr. Perilli at this February 2019 appointment. *Id.*

On June 24, 2022, Petitioner submitted a supplemental sworn declaration to provide an explanation for the origin of the photograph he submitted of himself (exhibit 16) and Dr. Perilli's letter (exhibit 8). Ex. 17 at 1.

Petitioner states that in September 2020, he reviewed his medical records for the first time and realized that the records did not document the complaints he raised regarding his shoulder pain at his March 2018 and July 2018 visits with Ms. Tucker and Dr. Perilli. *Id.* at 2. Therefore, Petitioner states he spoke to Dr. Perilli about the alleged omission and she "confirmed that we had such conversations" and that he then requested that "she write a letter confirming that these discussions took place since they were not documented in my medical records" and Dr. Perilli complied with Petitioner's request. *Id.*

Petitioner further states that in February 2022 following discussions with his attorney regarding any additional evidence to support his claim that he recalled taking a photograph the morning after his vaccination. *Id.* Petitioner states he found the photograph that was taken on November 23, 2017 at 8:12am as time stamped by his phone. *Id.* at 3. Petitioner asserts this photograph "'proves that the vaccine was administered high in my shoulder." *Id.*

### 4. Declaration of Lori Piscitelli

Petitioner submitted a sworn declaration from his girlfriend, Lori Piscitelli. Ex. 9. Ms. Piscitelli states that she was with Petitioner when his vaccine was administered and "noticed that it was given high in that shoulder." *Id* at 1-2. That same day, she recalls that Petitioner complained that he was "felt something uncomfortable and painful at the injection site" and that this pain was "constant, sometimes throbbing, and the pain worsened throughout the following days." *Id.* at 2. Ms. Piscitelli states that "due to the unusual and unprecedented onset of pain in his shoulder, I took a picture where the vaccine was administered." *Id.* Ms. Piscitelli recalls that Petitioner hoped his pain would improve and planned to discuss the pain with his primary care provider, Dr. Perilli, at his March 2018 appointment. *Id.* Ms. Piscitelli also states that in the Spring of 2018 Petitioner's neck and back pain became "worsening" and he delayed treatment in order to care for his seriously injured sister. *Id.* She states that at Petitioner's May 2018 appointment he focused only on his neck pain since he was very concerned it could be related to his spine, and that ultimately, he went to an orthopedic consultation for his ongoing shoulder pain in March 2019. *Id.*

### C. Discussion

On balance, and despite Petitioner's efforts to offer witness statements consistent with his allegations, the evidence in this case preponderates *against* a finding that Petitioner suffered the onset of his shoulder pain within 48 hours following the administration of his November 22, 2017 flu vaccine.

Most significant to my determination is the fact that contemporaneous medical records do not document *any* report of shoulder pain from Petitioner until *nearly 15 months* after his vaccination. During this time period, Petitioner was seen for multiple medical visits, including with an orthopedic specialist, but none of these providers documented any report that Petitioner experienced shoulder or arm pain. Ex. 1 at 342 (March 7, 2018 visit with Ms. Tucker, a certified nurse practitioner, at the office of Dr. Perilli for diabetes management); Ex. 6 at 7, 24-26 (May 25, 2018 Orthopedics visit: "This is a 51-year-old male with axial neck pain, limitations with range of motion which is been quite persistent and severe over the past 2 months. Ongoing episodic severe disabling low back pain."); Ex. 6 at 12-21 (detailed orthopedic patient intake forms filled out on May 25, 2018, containing no notations by Petitioner of any shoulder or arm pain); Ex. 6 at 57-61 (June 8, 2018 orthopedic visit to undergo cervical and lumbar MRIs); Ex. 6 at 62 (phone calls with orthopedic office to obtain MRI results and discuss physical therapy); and Ex. 1 at 371-73 (July 31, 2018 visit with Dr. Perilli for diabetes follow-up wherein he discussed stress related to injuries suffered by his father and sister, underwent a normal physical exam, and reported that he was in "[n]o distress.").

Given this record, it is unlikely that if Petitioner had been experiencing left shoulder pain *since* his November flu vaccination, he would not have raised that concern when he sought orthopedic care for other upper body issues in May 2018. And Petitioner's declaration fails to offer any persuasive explanation for his failure to do so. Even if Petitioner's neck and back pain was more severe or worrisome to him at that time (as asserted by Petitioner and Ms. Piscitelli in their sworn declarations), it seems unlikely he would not have also mentioned[5] that he had been also experiencing left shoulder pain and restrictions in his motion for the prior six months – even if he did not then believe the problems were related. Moreover, a physical examination of Petitioner's upper extremities was conducted at this appointment, and Petitioner's shoulder range of motion was found to be "normal and without pain." Ex. 6 at 26.

---

[5] Such mention is absent from both his May 2018 appointment and the extensive patient intake forms that he completed for this appointment, which specifically provided a space for Petitioner to report any left arm pain. Ex. 6 at 12.

Further, as I discussed in my Order to Show Cause, the non-medical record evidence in support of Petitioner's claim is not compelling for multiple reasons. Dr. Perilli's letter, for example, does not substantiate the allegations of Petitioner and his girlfriend, Ms. Piscitelli, that he suffered the onset of a left shoulder pain the same day as vaccination. Ex. 8. In fact, Petitioner was not even seen by Dr. Perilli at his first post-vaccination visit to her office on March 7, 2018. Dr. Perilli, therefore, has no demonstrated first-hand knowledge of what Petitioner reported at that appointment. And Petitioner's March 7, 2018 appointment with Ms. Tucker contains no indication that Petitioner was experiencing any shoulder pain.

Dr. Perilli's statement in her letter that Petitioner reported to her personally at his July 31, 2018 visit that "he felt his shoulder pain was from the November 2017 influenza vaccine" is also not worthy of significant weight, for several reasons. First, the letter was written *over two years* after Petitioner's July 2018 appointment – making it unclear how Dr. Perilli recalls the details of Petitioner reporting shoulder pain at his July 2018 visit, especially given that Petitioner's shoulder pain was not documented in the corresponding medical record. Second, the reliability of any report Petitioner made in July 2018 regarding the onset of his shoulder pain is reduced by the fact that this visit occurred *over eight months* after Petitioner's November 2017 vaccination.

I also do not find that allowing deposition discovery would appreciably improve Petitioner's chances of satisfying onset, given the degree to which the existing written record outweighs gainsaying by witnesses. Moreover, Petitioner has provided no declaration, or other statement, from Ms. Tucker to support the conclusion that she has any independent recollection of her March 7, 2018 visit with him. Rather, Petitioner argues that such "deposition testimony could *plausibly* provide evidence to satisfy the Table Injury onset requirement." ECF No. 35 at 10 (emphasis added). Given the consistent nature of the record – which does not merely omit reference to shoulder pain, but collectively suggests that was not the actual primary concern of Petitioner (as opposed to neck or lower back pain), it is not evident that discovery is necessary in this case – and it certainly does not become necessary simply because the Petitioner (who understandably hopes for his claim to succeed) asks for it.

Ultimately, the witness statements and other evidence offered[6] in this case do not preponderantly suggest a Table SIRVA onset. Although after-the-fact statements can

---

[6] The photograph submitted by Petitioner provides support *only* for the fact that Petitioner received a flu vaccine in his upper left shoulder on November 22, 2017. Ex. 16 at 1. But Respondent does not contest that issue. The photograph otherwise does not establish that Petitioner experienced *the onset of left shoulder pain within 48 hours of his vaccination*.

12

sometimes be deemed persuasive when consistent and compelling, the declarations submitted in this matter do not establish immediate onset. I acknowledge that the standard applied to SIRVA claims on the onset issue is fairly liberal and will often permit a determination that onset began within the 48-hour timeframe set by the Table, based on records prepared a few months after vaccination, and/or corroborated by sworn witness declarations or affidavits intended to amplify otherwise-vague records. But not every SIRVA claim can be so preponderantly established, and not where the medical record contradicts a Petitioner's allegations. Such is the case here: where the medical records consistently fail to document any shoulder pain for nearly 15 months, while also strongly suggesting that Petitioner's shoulder range of motion was normal and without pain on orthopedic examination approximately six months following his vaccination. Ex. 6 at 26.

## Conclusion

**I find Petitioner has not preponderantly established that the onset of his shoulder pain occurred within 48 hours of vaccination. Petitioner cannot proceed in this action with his Table SIRVA claim which is hereby dismissed.** I intend to reassign this case to my non-SPU docket by separate Order to allow Petitioner an opportunity to pursue an off-Table SIRVA claim.

**IT IS SO ORDERED.**

<u>s/Brian H. Corcoran</u>
Brian H. Corcoran
Chief Special Master